**FILED
CLERK**

4:19 pm, Mar 22, 2019

**U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE**

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK**
--------------------------------------------------------X
SHAINA DROUILLARD,

      Plaintiff,

    -against-

SPRINT/UNITED MANAGEMENT
COMPANY,

       Defendant.
--------------------------------------------------------X

**MEMORANDUM OF
DECISION & ORDER**
2:16-cv-02997 (ADS)(ARL)

<u>**APPEARANCES:**</u>

**Neil H. Greenberg & Associates, P.C.**
*Attorneys for the Plaintiff*
4242 Merrick Rd
Massapequa, NY 11758
  By: Justin M. Reilly, Esq.,
     Neil H. Greenberg, Esq., Of Counsel.

**Proskauer Rose LLP**
*Attorneys for the Defendant*
Eleven Times Square
New York, NY 10036-8299
  By: Harris Michael Mufson, Esq.,
     Steven D. Hurd, Esq.,

One Newark Center
Newark, NJ 07102
  By: Alychia Lynn Buchan, Esq., Of Counsel.

**Littler Mendelson P.C.**
*Attorneys for the Defendant*
532 Broadhollow Road Suite 142
Melville, NY 11747
  By: Lisa Marie Griffith, Esq.,
     Kimberly Natalie Dobson, Esq., Of Counsel.

1

**SPATT, District Judge**:

The plaintiff Shaina Drouillard (the "Plaintiff") brought this employment discrimination action against the defendant Sprint/United Management Company (the "Defendant") alleging that it discriminated against her based on her race and gender and retaliated against her for engaging in a protected activity in violation of, Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and the New York Executive Law § 290 *et seq.* ("NYHRL").

Presently before the Court is a motion by the Defendant, pursuant to Federal Rule of Civil Procedure ("FED. R. CIV. P." or "Rule") 56, seeking summary judgment dismissing the complaint. For the reasons that follow, that motion is granted in part and denied in part. Specifically, the Court denies the Defendant's motion with respect to the Plaintiff's race-based hostile work environment claims but grants the Defendant's motion with respect to the Plaintiff's gender-based hostile work environment claims and retaliation claims.

## I. BACKGROUND

Unless otherwise noted, the following facts are not in dispute. The Court draws these facts from the Defendant's Rule 56.1 Statement of Material Facts and the Plaintiff's Response. ECF 33 (the "SMF"). As a preliminary matter, the Court notes that both parties' briefs eschewed citations to the SMF in favor of direct citations to the record. This error or oversight wholly contradicts the purpose of requiring Rule 56.1 statements, which focus the Court's attention on the purportedly undisputed facts in the record to facilitate its determination of which issues properly remain for the jury. By failing to reference the SMF, the parties abdicated their responsibility to provide a thorough initial legal analysis. *See Allied Bldg. Prod. Corp. v. Pinsler*, No. 12-cv-6249, 2013 WL 2384268, at *2 (N.D. Ill. May 23, 2013) (explaining that citing Rule 56.1 statements in supporting memorandum "rather than citing directly to the record" is necessary "to streamline the summary

judgment process"). Although the Court was able to wade through the record to reach its conclusion, the process chosen by the parties occurred to the detriment of the efficient use of judicial resources. Bearing that in mind, the Court will proceed to the facts.

The Defendant is a telecommunications company that provides wireless and digital services to customers throughout the United States. The Defendant owns and operates approximately 1,100 retail stores nationwide. The Defendant has a Code of Conduct, conveyed to employees through its employee guide. The Code of Conduct contains an anti-harassment and anti-retaliation policy, which the Defendant also publishes and distributes as a separate document titled "Not Here, Not Ever." The Defendant's intranet also defines harassment and the different reporting mechanisms available to employees. Each employee must re-certify his or her reading and understanding of the Code of Conduct annually by an online refresher course, "i-Comply."

The Plaintiff is an African American female who is currently employed by the Defendant as an Assistant Store Manager ("ASM") for the Westbury, New York retail store. The Defendant hired the Plaintiff as a retail consultant in 2006 and promoted her to ASM in 2014. In March 2015, the Defendant transferred the Plaintiff to its retail location in Bay Shore. The dispute in this case relates to the Defendant's handling of incidents that occurred during her time at Bay Shore, culminating in her transfer to the Lake Grove location on June 27, 2015. The Plaintiff's claim stems from the behavior of her subordinate, a salesman at Bay Shore named Ebraheem Elkilany ("Elkilany"), who engaged in a pattern of racially and sexually offensive behavior.

## A. ELKILANY'S CONDUCT.

Elkilany called the Plaintiff a "nigger" on three occasions, and repeatedly used the word in her presence. One evening in April 2015, the Plaintiff and Elkilany were performing nightly closing procedures at Bay Shore. When the Plaintiff asked Elkilany to put away accessories, he

said to her either "listen my n word," or "[t]his 'N word' is always on my case about something." Thereafter, in late April or early May 2015, Elkilany again said "this 'N word' is always on my case." And, on May 9, 2015, the following incident occurred while the Plaintiff was sitting at a desk in the back of the breakroom at work:

> [Elkilany] came up next to me, and when he came next to me, he was too close so I asked him to step back. And he refused to move back. I was literally cornered on the desk because I couldn't move unless he moved away from me. And when I asked him to move, he wouldn't move. And then finally I extended my arm to move out and when I did, he said, "Oh, you just hit my nuts, now you need to massage it." And I asked him, "Please don't speak to me in that language. And please don't talk to me that way." And I go to step away, and he's like, "Oh, you're not going to massage my nut?" And I said, "Stop, Ebraheem, stop." Then he turned around and said, "Oh, this nigger again."

Although the Plaintiff testified that Elkilany only directly called her that slur on three occasions, she also testified that Ekilanly "repeatedly would use the word" in her presence and that he went about saying it like it "was just a regular, everyday word." Many of the times that he said the word, Ekilanly looked at the Plaintiff, as if he was trying to taunt her by directing it at her. For instance, Elkilany played a song at work that repeated the slur every other word, during which Elkilany would sing along and emphasize the slur while looking at the Plaintiff.

Other coworkers of the Plaintiff testified that Elkilany "very often" referred to African-Americans, including customers, as "niggers." One coworker, Christian Pineda ("Pineda") described the word as "just part of his vocabulary" and that he used it daily. Another coworker, Tiffany Pharr ("Pharr"), heard Elkilany use the slur at least 10-to-12 times and testified that he was "constantly saying it." Shaukat Alam ("Alam"), also a coworker of the Plaintiff, heard Elkilany say the word on a regular basis.

According to these coworkers, Elkilany specifically called the Plaintiff the epithet. Pineda heard Elkilany direct the word at the Plaintiff on two occasions, including saying the Plaintiff's

name and then calling her a "nigger." Pineda further testified that he told the Plaintiff that Elkilany called her the epithet. Pharr witnessed Elkilany say to the Plaintiff: "[y]ou're acting like a nigger." Pharr also explained that Elkilany used the word in a more aggressive context when he directed it at the Plaintiff. Asad Hamdani ("Hamdandi") testified that he heard Elkilany call the Plaintiff a "nigger" on one occasion and a "nigga" more than a handful of times. Hamdani also observed Elkilany ask the Plaintiff: "Do you have to be such a [n----r] or why do you have to be such a [n----r]."

In addition to witnessing Elkilany's racist remarks, the Plaintiff's coworkers also testified that Elkilany frequently used the term "bitch" in the store, and specifically directed the term at the Plaintiff. Pharr stated that Elkilany "went through the store and . . . called [the Plaintiff] a bitch." Pharr further testified that Elkilany called "us all bitches" and referred to women in the store as "bitches." Alam also heard Elkilany use the word "bitch" on several occasions in the workplace.

## B. THE INITIAL INVESTIGATION.

The parties disagree as to the nature, content, and frequency of the Plaintiff's complaints to management regarding Elkilany's conduct. According to the Plaintiff, she reported Elkilany's conduct to her supervisor and store manager, Serap Sezer ("Sezer") in April 2015, after the first time Elkilany directed a racial epithet at her. She also testified that she complained to Sezer many other times over the first half of 2015. The Defendant, on the other hand, seems to believe that the first time the Plaintiff reported Elkilany's conduct to Sezer was on May 9, 2015, when she told Sezer that only two alleged incidents occurred between her and Elkilany.

 On May 9, 2015, Sezer scheduled a meeting with Elkilany and the Plaintiff to discuss the Plaintiff's complaints. The parties present two different versions of the meeting. In the Plaintiff's view, Sezer scheduled the meeting upon the Plaintiff's request, after the Plaintiff complained on

several occasions with no action taken. The Plaintiff claims that, during the meeting, Elkilany admitted to calling her the "N word" but refused to apologize because in his view it wasn't malicious. Conversely, the Defendant's position is that Sezer called the meeting upon her own initiative, and after the Plaintiff reported only two incidents where Elkilany used the slur. In addition, the Defendant believes that Elkilany denied calling the Plaintiff that word and apologized to her in the meeting.

The parties also disagree about what occurred after the meeting. The Defendant claims that Sezer immediately forwarded the Plaintiff's complaint to Kenneth McQuiller ("McQuiller"), the district manager of 13 or 14 retail stores located throughout Long Island, and that the Plaintiff later that night also called McQuiller. On the other hand, the Plaintiff avers that she walked out of her meeting with Sezer and Elkilany, went to her car, had a panic attack, and then called McQuiller to report what was going on in the store. The parties agree that in this phone call the Plaintiff explained what happened and that McQuiller requested she send him an e-mail about the incidents.

That evening, the Plaintiff e-mailed McQuiller stating that she "had two issues with RC Ebraheem Elkilany about his behavior in the store towards [her]." She further reported that "[o]n two occasions [Elkilany] has called me outside of my name (Calling me the N word) . . . First time was about 3-4weeks ago and second time was today [May 9, 2015]." Although the e-mail did not mention the purported incident in early May, the Plaintiff testified that she told McQuiller about three separate incidents when they talked on the phone.

The next morning, May 10, 2015, McQuiller e-mailed the Plaintiff, asking if "any one else heard [Elkilany] make these two comments?" The Plaintiff replied that "Bob [Marine ("Marine")] and Sha [Alam] were there when [Elkilany] made the massage comment and [as for] the N word, no one was around but he admitted to it in front of Serap."

On May 12, 2015, McQuiller traveled to Bay Shore and interviewed the Plaintiff, Elkilany, Alam, and Marine about the complaints.

McQuiller documented his interview with the Plaintiff in an e-mail dated May 12, 2015. According to the e-mail, the Plaintiff reported only two incidents concerning Elkilany. With regard to the first incident, she explained to McQuiller that at some point prior to May 9, 2015, she asked Elkilany several times to go on break but he would not clock out. In response to her instruction, Elkilany said "[y]ou always on my case, leave me alone my N……." The Plaintiff further told McQuiller that when Elkilany made this comment she "took no action at that moment" but brought the incident to Sezer's attention on May 9, 2015. As for the second incident, the Plaintiff reported that she extended her arm to get up and, when she did, her arm touched Elkilany's belt buckle. McQuiller sent his documentation of the interview to the Plaintiff and asked her to "Please reply back . . . confirming or adding." Within hours, the Plaintiff responded, "[y]es, confirming everything is correct."

McQuiller also interviewed Elkilany on May 12, 2015. Elkilany denied the Plaintiff's version of the incident. Elkilany claimed he never specifically called the Plaintiff the epithet, but but admitted that he used the word in jest with other employees. Elkilany refused to tell McQuiller who else used the word in the workplace. McQuiller did not press Elkilany to find out the identity of those employees.

McQuiller told Human Resources Manager Sarah King ("King") that Elkilany admitted he and others were using the epithet in the workplace. McQuiller notified King that he was going to address the personnel in the store regarding this conduct. In response, King told Mcquiller that she did not want anyone transferred during the investigation. King neither directed McQuiller to issue a warning to Elkilany nor asked McQuiller to find out who else was using the word at the store.

After he conducted his interviews, McQuiller spoke to the Plaintiff, Elkilany, Alam and Marine. McQuiller told the Plaintiff that neither Alam nor Marine heard anything "and there is not much he can do at this point" but that "he would work with Ebraheem on his behavior." The Plaintiff responded "no problem."

According to the Defendant, a few days later, McQuiller held a meeting with the whole store, during which he provided a refresher on the Code of Conduct and told the employees that it was inappropriate to use the "N" word. The Plaintiff denies any such meeting happened, and Alam testified that she has no recollection of the meeting. Sezer testified that McQuiller did not say anything about the epithet at the meeting.

McQuiller did not otherwise discipline or reprimand Elkilany. McQuiller testified that he did not take any additional action because he was satisfied with Sezer's handling of Elkilany's behavior. McQuiller testified that Sezer met with Elkilany, sometimes on a nightly basis, to steer him towards more appropriate conduct at work. Sezer, however, testified that she never observed Elkilany speak inappropriate language at the store; denied that anyone told her Elkilany admitted to using the epithet in the workplace; and claimed that she never coached or counseled him.

The Plaintiff admits that after these events Elkilany never directly called her a "nigger" again but noted that he continued to use the word in the store and would look right at her when he was saying it. According to the Plaintiff, it was "like, he's really trying to direct it towards [her]." McQuiller, Sezer and King testified that the Plaintiff never reported this behavior, and that she only occasionally reported in a general way about Elkilany's disrespectful behavior.

## C. THE EVENTS AFTER THE INITIAL INVESTIGATION.

On May 27, 2015, one of the Plaintiff's coworkers, Nick Manzolina ("Manzolina"), "confided in [Tahisha Jenkins ("Jenkins")] about sexual harassment that was making him

uncomfortable." He reported to Jenkins that the Plaintiff "was rubbing up against him," "touching him on his butt," and "asked him to send . . . a picture of his penis." When Jenkins e-mailed Sezer and McQuiller about Manzolina's complaints on June 1, 2015, McQuiller forwarded the complaints to King.

On June 1, 2015, King interviewed Manzolina, the Plaintiff, and two other Bay Shore employees about Manzolina's allegations. Manzolina reiterated his concerns about the Plaintiff. The Plaintiff denied the allegations but conceded that she hugged Manzolina and "told him he had beautiful eyes."

Also on June 1, 2015, King sent herself an e-mail stating that the Plaintiff called her and said "I find it funny how I get a call about this, but when I had a complaint I did not get a call from you." According to the e-mail, when King pressed for details, the Plaintiff said "don't worry about it" and hung up.

On June 5, 2015, King sent herself another e-mail stating that she called the Plaintiff to ask for more information about the complaints. According to the e-mail, the Plaintiff "initially put a complaint about something and took it up to a [sic] management and ... never heard anything." The e-mail also notes that the Plaintiff e-mailed McQuiller and Sezer but never received a response, and that McQuiller told the Plaintiff "that he had taken action on it and it would be taken care of."

The Plaintiff denies that either call described in King's e-mails to herself occurred, claiming that she made the comments King recorded in her initial interview with King.

On June 16, 2015, the Plaintiff sent King an e-mail outlining her complaint. She alleged that: in April 2015, Elkilany "publicly and repeatedly called [her] the 'N-word'" and that she reported this conduct to Sezer and McQuiller; in May 2015, Elkilany said to her "his private part

was hurting" and asked her "[d]o you want to massage it for me?"; and "[o]n June 5, 2015, [she] revisited [her] concerns about Elkalani's continued use of the 'N' word," his "use of the 'N' word openly and during business" and how she had been "called a N-Word repeatedly." The complaint also alleges that Sezer attempted to induce her to lie to end King's investigation:

> After speaking to you and you asked me to send you the email that I originally sent regarding the incident, I received a phone call from Serap Sezer. During this conversation my manager (Sezer) told me, "It is better if you do not report this to HR and if they question you about it, lie!" She also followed up in a text message and asked me "Did you tell HR?" I replied "No" after which she replied "GREAT!"

On June 22, 2015, King sent the Plaintiff an e-mail containing the statement she collected from the Plaintiff and asking the Plaintiff to review the statement for accuracy. The statement alleged: that "Ebraheem Elkilany has repeatedly called [the Plaintiff] the n word"; that in April she "asked him to help out with closing procedures and he used it then"; that he "has used it in the store with other employees"; and that "around the 1st week of May" Elkilany "was in the backroom and was venting and started using the n word again." In addition to describing the May 8, 2015 meeting with Sezer and the Plaintiff's conversations with McQuiller, the statement recounts a June 5, 2015 conversation in which the Plaintiff "revisited her concerns with [Sezer] again." According to the statement, Sezer implored her not to speak with King, because "it is going to be a whole situation and it won't be good for you." Finally, the statement says "I don't blame Kenny because he is not at the store every day and I was ok with how Kenny handled the situation. Serap and Ebraheem need to be investigated further."

On June 24, 2015, King obtained a statement from McQuiller. With respect to the Plaintiff's "N" word allegations, McQuiller stated that he "did not think there was anything there with the ['N'] word and since she was not definitive with me about the situation and that she was

not sure if he said it." While he noted that maybe he should have been more formal with the Plaintiff, he stated that he investigated her allegations but found no corroborating evidence.

Also on June 24, 2015, King collected a statement from Alam. When asked if he witnessed Elkilany make any unprofessional or inappropriate comments, Alam stated Elkilany "speaks a lot of inappropriate language at the store. There have been times when he has cursed at other reps and I have taken it to management to let them know about it. I have told Serap Sezer about it." Alam told King that he did not hear Elkilany ask the Plaintiff for a "massage."

On June 26, 2015, King collected a statement from Marine. When asked if he witnessed Elkilany make any unprofessional or inappropriate comments on May 7, 2015, Marine stated: "I only heard what she said and that is what I told Kenny when he asked me about it. Ebraheem mumbled something and I did not hear what he said and she repeated out loud supposedly what he said which was do you want to massage my nuts." Marine told King that he did not hear Elkilany ask the Plaintiff for a "massage."

On July 2, 2015, King collected a statement from Sezer. Sezer denied the Plaintiff's assertion that she tried to resolve store issues "in house" rather than escalating them to McQuiller or Human Resources. Sezer stated that she "bring[s] it to the appropriate people. If employees are having a concern about other employees, if they feel that they are disrespected. [She] will bring it up to the employee's attention and [her District Manager]." Sezer told King that she notified McQuiller of the Plaintiff's "N" word concerns on May 9, 2015.

On June 30, 2015, King sent Elkilany an e-mail containing the statement she collected from him and asking him to review the statement for accuracy. In the statement, Elkilany denied the Plaintiff's allegations.

After collecting the witnesses' statements, King debriefed Regional Director Ron Bromberg ("Bromberg"). King determined that there was no evidence substantiating the Plaintiff's complaints against Elkilany. Bromberg did, however, coach McQuiller, and authorized a verbal warning to Sezer for failing to engage Human Resources in her investigation concerning the May 9, 2015 incident.

On July 17, 2015, King sent herself an e-mail indicating that she closed her investigation of the Plaintiff's claims against Elkilany.

**D. THE PLAINTIFF'S TRANSFER TO LAKE GROVE.**

On June 22, 2015, the Plaintiff accidentally forwarded a draft of the written statement collected by King to Sezer. In the e-mail, Plaintiff complained that Sezer failed her as a manager and requested that Sezer and Elkilany be investigated further.

On June 27, 2015, McQuiller transferred both the Plaintiff and Elkilany out of Bay Shore. McQuiller assigned the Plaintiff to Lake Grove and moved Elkilany to Bohemia. McQuiller testified that he believed transferring the Plaintiff to Lake Grove would allow her to refocus her efforts on her career and remove her from the distractions caused by the complaints against her. The Plaintiff first worked at Lake Grove in 2014 and had a "great rapport" with Store Manager Burak Tohumcu ("Tohumcu"). Therefore, McQuiller believed that store would be a great fit for the Plaintiff. McQuiller testified that when he notified the Plaintiff of the decision, she accepted the transfer without question or argument. In her deposition, the Plaintiff agreed that she "understood where [McQuiller] was coming from." However, she also testified that she did not want to leave Bay Shore; that she told McQuiller that she did not want to leave; and that she was transferred against her will. McQuiller admitted that "a good part of her wanted to stay there."

On July 9, 2015, Elkilany was involved in an altercation at the Bohemia store with Retail Consultant Josh Pagan ("Pagan"). Pagan accused Elkilany of asking him whether he would be scared of his ".32." Although Elkilany denied Pagan's accusations, McQuiller immediately removed Elkilany from the store while corporate security investigated the matter further.

On July 22, 2015 the Defendant transferred Elkilany to Lake Grove, with a start date of July 24, 2015. McQuiller notified Tohumcu of Elkilany's assignment, who in turn informed the Plaintiff and the other Lake Grove ASM, Andrew Muhlhauser ("Muhlhauser").

On July 23, 2015 at 10:38 a.m., the Plaintiff notified Muhlhauser that Elkilany "text[ed]" her and "told [her about his assignment to Lake Grove]." Muhlhauser asked the Plaintiff "[w]hat did [Elkilany] say was he nice?" The Plaintiff responded "[y]es." The Plaintiff then sent Muhlhauser two images, after which Muhlhauser responded "wat a tool guy better behave himself not mess with eve or miranda." The Plaintiff replied "Good luck with that." At 12:00 p.m. that same day, the Plaintiff then notified Tohumcu and Muhlhauser that Elkilany was "texting [her] asking for [the] schedule." Tohumcu responded to "[g]ive him a temp schedule for now." The Plaintiff responded to Tohumcu's request with "[g]o ahead Andrew."

Tohumcu testified that the Plaintiff did not inform him of any complaints of mistreatment by Elkilany prior to his arrival at the store. Muhlhauser testified that the Plaintiff told him "she didn't have a good experience" but that he didn't "know what her experience was in detail."

On July 24, 2015, Elkilany arrived at Lake Grove. After less than an hour with Elkilany, the Plaintiff informed Tohumcu and Muhlhauser that she did not "feel comfortable" at the store. Tohumcu testified that after receiving this text, he had a conversation with the Plaintiff in which she informed him that she was uncomfortable working with Elkilany but would not provide him the details. On the other hand, the Plaintiff testified that during this conversation she told Tohumcu

about the incidents at Bay Shore and that she was waiting to hear from King about the investigation. After the conversation, Tohumcu called McQuiller and let him know that the Plaintiff was upset about Elkilany's presence at the store. On the call, McQuiller told Tohumcu he was "shocked" because he thought he transferred Elkilany to a different store and forgot that the Plaintiff worked at Lake Grove.

The Plaintiff also called McQuiller, but claims she was too emotional to talk to him so she sent him an e-mail. In that e-mail, the Plaintiff said to McQuiller:

> I would like to understand my HR case that I had in my previous store and the reasons why I got transferred? Employee Ebraheem Elkalani made an unsafe mental work environment with his racial and sexual comments towards me, so I do not understand that part why I got transferred but Now Ebraheem Elkalani has been transferred to my current store (Lake grove) after repeatedly addressing me as a Nigger and making sexual comments towards me. I feel emotionally unsafe to work in the same environment as him as his behavior is unpredictable.

With regard to Elkilany's transfer to Lake Grove, McQuiller responded: "I am a knucklehead as I totally blanked out and forgot u were there. Can't apologize enough it was a very last minute decision. Anyway he is gone and not coming back. My fault entirely Shy I feel terrible that it upset u. Won't happen again." As for why McQuiller transferred the Plaintiff, he wrote:

> Shy I thought you were unhappy in Bay Shore after everything that happened. I thought your career had gotten off track there and you were not focusing on development. I figured that Lake Grove is a place you can grow again, take a breath and get back to doing what you do best without having issues (not yours) pop up frequently. On this stuff I'm sure I'm right.

The Plaintiff replied "Thanks."

After McQuiller was notified that the Plaintiff expressed discomfort working with Elkilany, he made Elkilany leave Lake Grove. In total, Elkilany was at Lake Grove for only a few hours. In her deposition, the Plaintiff testified that McQuiller "knew [she] was in the store" but that he "just thought it would be okay to transfer [Elkilany] there and didn't expect my reaction,

which neither did [she] . . ." The Plaintiff further testified that Elkilany's transfer was not in order to discriminate against her. Rather, according to the Plaintiff, "[McQuiller] did it because he thought everything was okay after the investigation started."

The Defendant terminated Elkilany's employment on or about August 20, 2015. On August 22, 2015, the Plaintiff e-mailed McQuiller stating: "As we spoke about Ebraheem has been contacting me since he was terminated, saying that I owe him money for my nails (which is false) and that I was the reason behind him getting terminated. I blocked his number from my phone and he called me from a different number." McQuiller responded that he was "getting the same from [Elkilany]" too and recommended that the Plaintiff contact the police. He also informed the Plaintiff that he updated King.

After the Plaintiff's August 22, 2015 e-mail, the Defendant provided security for her at Lake Grove for at least a week. In addition, the Plaintiff was escorted to and from her car when arriving at and leaving the store. Within a few days, Elkilany ceased contacting the Plaintiff.

**E. THE DENIAL OF VACATION REQUESTS WHILE AT LAKE GROVE.**

On June 26, 2015, the Plaintiff sent Tohumcu an e-mail titled "request" that stated "July 4th- off[.] July 7th- off or open (my niece birthday) July 11 and July 18th off (baby shower/communion) August 5th-10th off (going to Haiti) November 13-21st off (going to Paris)."

On July 15, 2015, the Plaintiff sent Tohumcu and Muhlhauser an e-mail stating:

Hey guys, it seems to always be a confusion when it comes to schedule and my already approved requests. I understand need of the business but I also have compromised most of my approve days so far to help out and explain to Andrew that certain days were off the table since I already made plans and these request were approved 1 to 2 months prior to me being transferred. I understand that this is a different store and also understand that I did not ask to be transferred. Going forward if we can work this out, I would gladly appreciate.

In her deposition, the Plaintiff testified as follows:

I had vacations that were approved by Serap when I was in Bay Shore. And when I got to Lake Grove, those days were denied because due to the lack of staff. And I tried to explain to Burak and Andrew, I even wrote them an e-mail letting them know I did not request this transfer, I did not want this transfer, and I don't understand why my days that were already approved are being denied. One of them was for my niece ' s birthday. I couldn't get that day off because they already had several people on vacation and I was being told that it was no longer going to be approved. My vacation, I had to shorten my vacation because there were people on vacation. So, again, there were -- I needed off Fridays to go to chemo with my uncle. I couldn't get Fridays approved because somebody else was off on Fridays . So, I literally had to have a discussion with Burak about why I needed to have Fridays off before he could approve it and everything else. It was like "Oh, due to the need of the business, or due to this person being on vacation, we're going to have to change your vacation or we ' re going to have to deny this request."

## F. The Denial of An Application for Promotion to the Deer Park Store Manager Position.

In early June 2015, the Defendant posted a job opening for a Store Manager position at its Deer Park location. Deer Park was a temporary "pop-up" store in McQuiller's district that was converted to a permanent retail location. The Plaintiff submitted her resume for consideration.

On June 23, 2015, McQuiller and a panel of Store Managers from his district (comprised of Sezer and Carol Budhram) interviewed several candidates, including the Plaintiff and Levon Kennedy ("Kennedy"), for the position.

McQuiller selected Kennedy. McQuiller testified that, with the consensus of the panel, he decided that Kennedy surpassed the other candidates in energy and creativity and articulated his business plan effectively. Sezer, however, testified that McQuiller made the decision alone without the input of the panel, who was only there to share notes.

In an August 2, 2015 e-mail to the Plaintiff, McQuiller gave positive feedback to assist her in future interviews and assured her that he was "[l]ooking forward to [her] being a store manager one day with [him.]"

The Defendant no longer operates the Deer Park store.

# II. DISCUSSION

## A. The Legal Standard.

Under Rule 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "The Court 'must draw all reasonable inferences and resolve all ambiguities in favor of the non-moving party.'" *Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc.*, 150 F.3d 132, 137 (2d Cir. 1998) (quoting *Garza v. Marine Transp. Lines, Inc.*, 861 F.2d 23, 26 (2dCir.1998)).

"'[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Redd v. N.Y. State Div. of Parole*, 678 F.3d 166, 173–74 (2d Cir.2012) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

Further, in discrimination cases, "[d]istrict courts are cautious about granting summary judgment when intent is at issue since 'a victim of discrimination ... is seldom able to prove his or her claim by direct evidence and is usually constrained to rely on the cumulative weight of circumstantial evidence.'" *Martin v. State Univ. of New York*, 704 F.Supp.2d 202, 220 (E.D.N.Y.2010) (quoting *Rosen v. Thornburgh*, 928 F.2d 528, 533 (2d Cir.1991)). Nevertheless, "'even in the fact-intensive context of discrimination cases,' '[i]t is now beyond cavil that summary judgment may be appropriate.'" *EEOC v. Bloomberg, L.P.*, 967 F.Supp.2d 816, 830 (S.D.N.Y.2013) (quoting *Abdu–Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001). As one district court in this District noted:

> [A]lthough courts should be particularly cautious about granting summary judgment to an employer in a discrimination case when the employer's intent is in question, and should carefully scrutinize affidavits and depositions for circumstantial proof that, if believed, would show discrimination, a plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment.

*Slattery v. Peerless Imps., Inc.*, 04-cv-0275, 2005 WL 1527681, at *3–4 (E.D.N.Y. June 29, 2005) (internal citation and quotation marks omitted); *see also Bloomberg*, 967 F.Supp.2d at 831 ("[A] plaintiff alleging discrimination claims 'cannot escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts ... or defeat the motion through mere speculation or conjecture.'" (quoting *Jones v. Hirschfeld*, 348 F.Supp.2d 50, 59 (S.D.N.Y.2004)); *Martin*, 704 F.Supp.2d at 220 ("Even in the discrimination context, ... a plaintiff 'must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment'" (quoting *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir.1997)).

**B. As to the Plaintiff's Hostile Work Environment Claims.**

The Court denies the Defendant's motion for summary judgment with respect to the Plaintiff's race-based claims but grants the Defendant's motion with respect to her gender-based claims.

### 1. The Standard of Review.

The Plaintiff's hostile work environment claims under Title VII and NYSHRL are analyzed using the same legal standard. *See Russo v. New York Presbyterian Hosp.*, 972 F.Supp.2d 429, 449 (E.D.N.Y. 2013); *Lumhoo v. Home Depot United States*, 229 F.Supp.2d 121, 152 n. 27 (E.D.N.Y. 2002).

"Title VII prohibits an employer's conduct that 'has the purpose or effect of ... creating an intimidating, hostile, or offensive working environment,' and 'affords employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult.'" *Lumhoo*, 229 F.Supp.2d at 152 (quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)). "[T]o establish a hostile work environment claim under Title VII, a plaintiff must produce evidence that the complained of conduct '(1) is objectively severe or pervasive—

that is, creates an environment that a reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment because of the plaintiff's ... protected characteristic.'" *Russo*, 972 F.Supp.2d at 446 (quoting *Robinson v. Harvard Prot. Servs.*, 495 Fed.Appx. 140, 141 (2d Cir.2012)).

"To withstand summary judgment, [the] Plaintiff must produce evidence that 'the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult, that the terms and conditions of her employment were thereby altered.'" *Id.* (quoting *Mills v. S. Conn. State Univ.*, 519 Fed.Appx. 73, 75 (2d Cir.2013)). "[T]he Second Circuit has cautioned [that] the existence of a hostile work environment is a mixed question of law and fact" which is "especially well-suited for jury determination and summary judgment may be granted only when reasonable minds could not differ on the issue." *Dabney v. Christmas Tree Shops*, 958 F.Supp.2d 439, 458 (S.D.N.Y.2013).

### 2. As to the Hostility of the Workplace.

"In examining whether an environment is sufficiently hostile or abusive, courts consider the totality of the circumstances, including such factors as (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether the conduct was physically threatening or humiliating, or a mere offensive utterance; (4) whether the conduct unreasonably interfered with plaintiff's work; and (5) what psychological harm, if any, resulted.'" *Lumhoo*, 229 F.Supp.2d at 152. In this regard, the Court notes that, although "the standard for establishing a hostile work environment is high, ... [t]he environment need not be 'unendurable' or 'intolerable.'" *Sclafani v. P.C. Richard & Son*, 668 F.Supp.2d 423 (E.D.N.Y.2009) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir.2003)); *see also Fitzgerald v. Henderson*, 251 F.3d 345, 358 (2d Cir.2001) (noting that "invidious

harassment that did not make the plaintiff's job unendurable or intolerable may support a claim of hostile work environment ...").

Before assessing the hostility of the work environment, the Court must first address the treatment of the Plaintiff's allegation that she suffered both race- and gender-based hostility. The Second Circuit has expressly declined to address whether a plaintiff may establish a hostile work environment claim by aggregating hostility towards different protected characteristics. *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 572 n.7 (2d Cir. 2000) ("A question remains as to whether a plaintiff may aggregate evidence of racial and sexual harassment to support a hostile work environment claim where neither charge could survive on its own."). "It is, however, settled law that different forms of harassment may exacerbate each other, meaning that abuse against various different groups . . . exacerbates the effect of harassment experienced with respect to each characteristic individually." *Daniel v. T&M Prot. Res. LLC*, No. 13-cv-4384, 2018 WL 3621810, at *18 (S.D.N.Y. July 19, 2018). Conversely, "aggregation is inappropriate where . . . the claim sought to be buttressed is patently inadequate." *Weiss v. Hustedt Chevrolet*, No. 05-cv-4230, 2009 WL 2132444, at *8 (E.D.N.Y. July 13, 2009). The Court will therefore only aggregate different types of discrimination when it will "nudge, but not catapult, a claim across the line between merely offensive conduct and conduct sufficient to establish a hostile work environment." *Id.*; *Duarte v. St. Barnabas Hosp.*, 265 F. Supp. 3d 325, 349 (S.D.N.Y. 2017).

With these principles in mind, the Court finds that the Plaintiff carried her burden to withstand summary judgment on the element of hostility for her race-based claims, but not her gender-based claims.

### a. As to the Race-Based Hostility.

For the most part, the parties agree about what comments Elkilany made to the Plaintiff. Specifically, Elkilany made three statements to her that included the word "nigger"—namely, (1) between April and May 8, 2015, Elkilany said, "You know, this ['N' word] is always on my case" on two occasions; and (2) on May 9, 2015 Elkilany said, "Oh, this nigger again." In addition, Elkilany used the "N" word "in general." The parties diverge, however, over the severity of these comments. In the Defendant's view, Elkilany's comments only reveal an atmosphere of insubordination towards a superior, not racial hostility. As a result, the Defendant believes that Elkilany's behavior failed to create a racially hostile work environment. The Court disagrees.

"Courts have repeatedly concluded that the use of the word 'nigger' in the workplace is particularly odious and offensive." *Anderson v. Phoenix Beverages, Inc.*, No. 12-cv-1055, 2017 WL 9481014, at *14 (E.D.N.Y. July 17, 2017), *report and recommendation adopted*, 2017 WL 4767447 (E.D.N.Y. Sept. 30, 2017). As the Second Circuit has "emphasize[d]," "perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as 'nigger[.]'" *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 24 (2d Cir. 2014); *see also White v. BFI Waste Servs., LLC*, 375 F.3d 288, 298 (4th Cir. 2004) ("'Far more than a "mere offensive utterance, the word "nigger" is pure anathema to African-Americans.'"); *Hrobowski v. Worthington Steel Co.*, 358 F.3d 473, 477 (7th Cir. 2004) ("Given American history, we recognize that the word 'nigger' can have a highly disturbing impact on the listener. Thus, a plaintiff's repeated subjection to hearing that word could lead a reasonable factfinder to conclude that a working environment was objectively hostile."). In fact, the word is so abhorrent that "there may well exist circumstances where a single use of the word 'nigger' would rise to the level of a hostile work environment."

*Albert-Roberts v. GGG Const., LLC*, 542 F. App'x 62, 64 (2d Cir. 2013); *see also Lovejoy v. Gure-Perez*, No. 10-cv-5748, 2014 WL 2459656, at *5 (E.D.N.Y. May 21, 2014) ("Plaintiff testified that she was called "nigger" by her supervisor in an aggressive and intimating tone, with saliva falling onto her body, and loudly enough for others to hear it. Whether considered alone or with additional evidence, this is sufficient to create a hostile work environment.").

While the facts here do not constitute such a circumstance, the Defendant's characterization of the slur fails to recognize its historical baggage. The term itself evinces a hatred and disgust of African Americans and invokes dehumanizing stereotypes that served to justify centuries of social, economic and political discrimination. Elkilany may have called the Plaintiff the epithet during incidents of insubordination. However, that fact alone does not wipe away the undeniably racially hostile connotation it carries. Insubordinate behavior can also be racist. In fact, it is entirely possible that racial animus motivated the insubordination. As a result, it is not evident from the record the Plaintiff only took Elkilany's behavior as a sign of disrespect and not as a sign of racial hostility, especially considering that the Plaintiff testified that she took particular offense to the word because of her race.

In support of its argument, the Defendant attempts to analogize this case to *Whitley v. Montefiore Medical Group*, No. 13-cv-4126, 2016 WL 1267788 (S.D.N.Y. Mar. 30, 2016). In *Whitley*, two subordinates of the plaintiff, who were persons of color, used profanity and the "N word" in her presence and at least once to address her. The court found that "the context presented by Plaintiff's evidentiary proffers [was] not one of racial hostility" but rather "an atmosphere of excessive interpersonal familiarity with, and insubordination toward, a former co-worker who was now tasked with supervising vulgar employees." *Id.* at *10. The court based this conclusion on "the transcript of her deposition testimony" which showed that "she subjectively interpreted the

use of this language as a demonstration of insubordination, rather than a race-based affront." *Id.* n.11.

In support of its analogy, the Defendant alleges the Plaintiff continued to work with Elkilany after the incidents; that she never requested that they work different shifts or to have Elkilany removed from the store; that she never reported his use of the word outside of May 9, 2015; and that she never used her authority as Eklilany's supervisor to discipline him. It is not immediately apparent why these facts resemble those in *Whitley*. Perhaps the Defendant is implying that Elkilany behavior did not actually offend the Plaintiff. However, the Defendant cites no direct evidence supporting that conclusion, and the Plaintiff's testimony contradicts the Defendant's characterization. Because the Court must draw all inferences in the Plaintiff's favor at this stage, it cannot conclude that the Plaintiff did not perceive Elkilany's behavior as racially hostile from this evidence alone.

The Defendant further attempts to diminish the hostility of the Plaintiff's work environment by characterizing Elkilany's behavior as isolated instances. But Elkilany did not just use the word in the three incidents pointed to by the Defendant. He routinely repeated the word in the Plaintiff's presence, often making eye contact with her so as to communicate that the word was directed towards her. Elkilany so openly flaunted his use of the term that other coworkers testified that it was, in effect, part of his daily vocabulary. Although Elkilany may not have specifically called the Plaintiff a "nigger" in those other instances, the Defendant provides no explanation why the word is any less offensive when used in this manner. The Defendant challenges these accusations by averring that the Plaintiff never raised them until her deposition and that she could not recall specific instances when Elkilany used the word in this manner. This argument merely questions the credibility of the Plaintiff's testimony, an issue properly left to the jury.

In the Defendant's view, the Court should not consider Elkilany's everyday use of the epithet because the Plaintiff apparently bases these accusations "exclusively on self-serving deposition testimony of Pharr, Pineda, and Hamdani that they witnessed Elkilany engage in additional conduct not witnessed by [the Plaintiff] and of which [the Plaintiff] was not aware." ECF 35 at 7–8. The Defendant is correct that "a plaintiff does not have a viable hostile work environment claim where that plaintiff is not the target of harassment, is not present for any harassment, and has no knowledge of the harassment while it is ongoing." *Maines v. Last Chance Funding, Inc.*, No. 17-cv-5453, 2018 WL 4558408, at *10 (E.D.N.Y. Sept. 21, 2018) (Spatt, J.). However, Pharr, Pineda, and Hamdani all testified that they witnessed Elkilany use the word *in the Plaintiff's presence*. And as the Defendant admitted in its opening brief, the Plaintiff herself testified about witnessing such behavior. ECF 31-1 at 17. As a result, the third-party testimony at issue is much more probative than the after-the-fact hearsay the Defendant asserted it to be.

Viewing the three overt incidents where Elkilany slurred the Plaintiff in conjunction with the testimony about his general use of the epithet, the Court is satisfied that enough evidence exists to create a genuine dispute as to the frequency and severity of the harassment alleged. *See Benedith v. Malverne Union Free Sch. Dist.*, 38 F. Supp. 3d 286, 313–14 (E.D.N.Y. 2014) (Spatt, J.) (finding that plaintiff presented sufficient evidence of a hostile work environment based on allegations that coworker "regularly called her 'nigger'"); *Lumhoo*, 229 F. Supp. 2d at 155 ("In the instant matter, a reasonable person could find that his working conditions altered for the worse if over the course of five months or seven months, various management employees as well as a co-worker used the word 'nigger' in his presence, referred to an African-American as a 'moolie,' 'black son of a bitch,' 'tar baby,'' 'porch monkey,' made a joke that disparaged blacks and referred to them as 'jungle bunnies,' and addressed black individuals as 'you people''); *Anderson*, 2017 WL 9481014, at *15

24

(denying summary judgment when evidence showed the Plaintiff "suffered racial abuse throughout his tenure" including being called a "nigger" and use of the slur in office talk); *Franco v. HMS Host Corp.*, No. 08-cv-2638, 2010 WL 11627256, at *7 (E.D.N.Y. June 2, 2010) ("Certainly a juror could reasonably conclude that being around such conduct on a daily basis, and facing detestable language such as 'nigger' and 'black bitch' would constitute sufficient quantity, frequency and severity of slurs to create a hostile work environment from both an objective and subjective standpoint.").

Accordingly, the Court denies the Defendant's motion for summary judgment with respect to the claim that Elkilany's conduct was insufficiently severe or pervasive to create a hostile work environment on the basis of the Plaintiff's race.

### b. As to the Sex-Based Hostility.

The Plaintiff bases her gender-based hostile work environment claim, first, on the May 9, 2015 "massage" incident and, second, on Elkilany's reference to women in the store as "bitches," which included specifically calling the Plaintiff a "bitch." The Court agrees with the Defendant that these allegations cannot establish a hostile work environment claim.

Starting with the "massage" incident, the Plaintiff alleges that Elkilany came into the break room, got close to her, and cornered her by the desk. When he refused to move, she extended her arm to move him, resulting in a back and forth where Elkilany asked the Plaintiff to massage his testicles. The Plaintiff testified that she construed this exchange with Elkilany as a sexual proposition. However, plaintiffs cannot establish a hostile work environment claim based on a single sexual advance by a coworker. *Cohen v. Litt*, 906 F. Supp. 957, 965 (S.D.N.Y. 1995). In order to rise to the level of severity necessary to attach Title VII liability, there would have to be evidence of some egregious action or a series of ongoing sexual advances by Elkilany. *See Brennan*

*v. Metro. Opera Ass'n, Inc.*, 192 F.3d 310, 318 (2d Cir.1999) ("Isolated, minor acts or occasional episodes do not warrant relief ... a plaintiff must still prove that the incidents were 'sufficiently continuous and concerted' to be considered pervasive or that a single episode is 'severe enough' to establish a hostile working environment.").

Although the Plaintiff testified that Elkilany came close to her and initially blocked her exit, she made no allegation that he attempted to use physical force or intimidation. In fact, her testimony states that she left immediately after Elkilany made his offensive comments and reported the incident to Sezer. This incident, as described by the Plaintiff, is insufficiently severe as a matter of law. *See Davis v. Verizon Wireless*, 389 F. Supp. 2d 458, 475 (W.D.N.Y. 2005) (granting summary judgment against claim based on sexual overtures of a supervisor where the coworker "the coworker "never touched her inappropriately at any time during her employment" and after the plaintiff rejected a initial sectional overture "there were no further advances").

The Plaintiff attempts to bolster her claim for hostility by claiming that "Elkilany repeatedly harassed Plaintiff and acted inappropriately toward her the majority of the time she worked with him." ECF 32 at 17. In support of this claim, the Plaintiff refers to testimony by Pharr that Elkilany went through the store and called Plaintiff "a bitch" and referred to women in the store as "bitches." Pineda and Alam also testified that Elkilany used the word "bitch" in the workplace.

This testimony is of questionable relevance. While evidence of comments made outside the Plaintiff's presence may serve as circumstantial evidence of hostility, that is only the case if the comments subjectively impacted the Plaintiff's working environment. *See Maines*, 2018 WL 4558408, at *10 (explaining that "the Court will only consider alleged incidents of hostility which were not directed at a particular plaintiff or incidents occurring when a particular plaintiff was not

present only to the extent that plaintiff shared the same 'environment—broadly conceived—as the person allegedly harassed' and that her [or his] own employment was adversely affected by the harassment"). The testimony of her coworkers only provides one specific instance where Elkilany directed that term at the Plaintiff or said the word in front of her. Further, the Plaintiff did not testify about these comments in her deposition or proffer contemporaneous documents illustrating that she overhead the comments. Given the absence of additional evidence that Elkilany called her the term, the Plaintiff failed to meet her burden of production in this regard.

Regardless, assuming that the Plaintiff overheard the comments, they lack the severity necessary to create an objectively hostile work environment. Although the Second Circuit has recognized that the use of the word "bitch" in many contexts reflects hostility, it "reject[ed] a rule that would automatically command an inference of gender-based hostility to be drawn from its use." *Pucino v. Verizon Wireless Commc'ns, Inc.*, 618 F.3d 112, 118 (2d Cir. 2010). The Plaintiff cites almost no evidence regarding the frequency with or context in which Elkilany used the word. At most, another coworker stated that he heard Elkilany use the word "on several occasions" in the workplace. "[C]ourts have regularly concluded that the occasional use of that term is not severe enough to create a hostile work environment." *Beale v. Mount Vernon Police Dep't*, 895 F. Supp. 2d 576, 589 (S.D.N.Y. 2012) (collecting cases); *see also Garone v. United Parcel Serv., Inc.*, 436 F. Supp. 2d 448, 469 (E.D.N.Y. 2006) (granting summary judgment against plaintiff who alleged coworker made "occasional-and discontinued-use of the generic terms 'office bitch,' 'brooklyn bimbettes,' and 'cat fight'" because they were "neither severe, nor physically threatening, nor did it interfere with [the plaintiff's] job performance"); *Spina v. Our Lady of Mercy Med. Ctr.*, No. 97-cv-4661, 2003 WL 22434143, at *3 (S.D.N.Y. Oct. 23, 2003) ("[D]efendant's actions were not

sufficiently severe. In particular, defendant's comments, though distasteful, were limited and made sporadically. He called plaintiff a "bitch," for example, a mere two times.").

Even viewing Elkilany's comments in conjunction with the "massage" incident, the Court does not believe the totality of the circumstances create a genuine dispute over a material fact. The Court recognizes that "the line between boorish and inappropriate behavior and actionable sexual harassment ... is admittedly indistinct" and that this "haziness counsels against summary judgment." *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 605 (2d Cir. 2006). The Plaintiff must nonetheless meet her burden of production in order to justify bringing an issue to the jury. One sexual advance combined with vague allegations of lewd language in the workplace does not reach that threshold. As a result, this case is distinguishable from *Bentivegna v. People's United Bank*, No. 14-cv-599, 2017 WL 3394601 (E.D.N.Y. Aug. 7, 2017) (Spatt, J.), which the Plaintiff relies on, where a supervisor "belittled the Plaintiff because of her gender in front of male co-workers on more than one occasion, and made sexually inappropriate comments several times in front of the Plaintiff." *Id.* at *14.

Therefore, the Court grants the Defendant summary judgment with respect to the Plaintiff's gender-based hostile work environment claims.

### 3. As to Whether the Plaintiff May Impute Elkilany's Conduct to the Defendant.

"Once a plaintiff has established the existence of a hostile workplace, she must then demonstrate that the harassing conduct 'which created the hostile situation should be imputed to the employer.'" *Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 63 (2d Cir.1998) (quoting *Kotcher v. Rosa and Sullivan Appliance Ctr., Inc.*, 957 F.2d 59, 63 (2d Cir.1992)); *see Smith v. Town of Hempstead Dep't of Sanitation Sanitary Dist. No. 2*, 798 F.Supp.2d 443, 452 (E.D.N.Y.2011) (Spatt, J.) (noting that in order to succeed on a hostile work environment claim against an

employer, the plaintiff "must show that 'a specific basis exists for imputing the conduct that created the hostile work environment to the employer.'" (quoting *Petrosino v. Bell Atlantic*, 385 F.3d 210, 221 (2d Cir. 2004)).

In general, an employer will be liable for a hostile work environment in the workplace when the employer knows of the hostile work environment but fails to take appropriate remedial steps. *Duch v. Jakubek*, 588 F.3d 757, 763 (2d Cir.2009). Since this is not a case of supervisory harassment, in that the Plaintiff was Elkilany's supervisor, "the employer will be liable only if it is negligent, that is, if it either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it." *Richardson v. New York State Dep't of Correctional Service*, 180 F.3d 426, 441 (2d Cir.1999). The Court analyzes whether an employer's remedial actions were sufficient based on the totality of the circumstances. *Duch*, 588 F.3d at 763 (citing *Distasio*, 157 F.3d at 63). In the context of summary judgment, "[i]f the evidence creates an issue of fact as to whether an employer's action is effectively remedial and prompt, summary judgment is inappropriate." *Gallagher v. Delaney*, 139 F.3d 338, 348 (2d Cir.1998), *abrogated on other grounds by Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998).

The Defendant contends that it cannot be liable for Elkilany's conduct because it took prompt remedial action. According to the Defendant, the Plaintiff first notified Sezer of Elkilany's comments on May 9, 2015. Immediately thereafter, Sezer held a meeting between the two, which resulted in an investigation by McQuiller. During his investigation, McQuiller collected a written statement from the Plaintiff and interviewed the Plaintiff, Elkilany and two other witnesses. After the investigation, McQuiller held a meeting with the whole store, during which he gave a refresher on the company's Code of Conduct. The Defendant further claims that the Plaintiff admitted her

satisfaction with how McQuiller handled her complaints and that she never reported additional discriminatory conduct by Elkilany. While it is undisputed that the Defendant took some remedial actions, a genuine dispute over a material fact exists as to the promptness and effectiveness of the Defendant's response.

With respect to promptness, the Defendant relies on McQuiller's testimony and the Plaintiff's May 12, 2015 statement to McQuiller, which reported "two incidents" with Elkilany. In the statement, the Plaintiff confirms that after the first incident with Elkilany she "took no action at that moment but did bring [it] to [Sezer's] attention" on May 9, 2015. The Defendant is correct that the admissions in this statement strongly support the conclusion that the Plaintiff never actually reported much of the complained-of behavior. The document also shows that the Defendant responded relatively quickly to the specific incidents mentioned in the statement. The Plaintiff, however, testified in her deposition that, in addition to the May 9, 2015 incident, she also complained to Sezer the day after the first incident, on approximately April 8, 2015, and after another incident in late April. She also testified that she mentioned Elkilany's repeated use of the epithet "over and over" to Sezer.

The Court can theorize situations in which a plaintiff's *post hoc* recollection of events might be insufficient to withstand summary judgment when contradicted by a contemporaneous document under the "sham issue of fact" doctrine. However, courts generally limit application of the doctrine to disputes between affidavits and previous sworn testimony, not documents that predate the litigation. *See generally In re Fosamax Prod. Liab. Litig.*, 707 F.3d 189, 193 (2d Cir. 2013) (explaining the "'sham issue of fact doctrine,' which prohibits a party from defeating summary judgment simply by submitting an affidavit that contradicts the party's previous sworn testimony"). Moreover, where there is a disagreement over whether the documents accurately

reflected contemporaneous circumstances, courts tend to leave those disputes for the jury to weigh. *See DeNigris v. New York City Health & Hosps. Corp.*, 861 F. Supp. 2d 185, 195 (S.D.N.Y. 2012) (denying summary judgment when a party "testified during her deposition that the contemporaneous documents she had created concerning Plaintiff's relationships with others or her job performance were false when she created them and/or that with hindsight she no longer believes they are accurate").

Further, the Plaintiff's May 12, 2015 statement is not so strongly worded that it precludes her deposition testimony. Specifically, the notation that she "took no action at the moment" is not exclusive of the possibility that she reported Elkilany's behavior to Sezer in other instances. Although this is a somewhat charitable reading of the statement, the Court must draw all inferences in the Plaintiff's favor. Helping the Plaintiff's case, McQuiller testified that Elkilany admitted in his interview that he and other employees used the epithet in the work place. The Plaintiff's coworkers also testified that they complained to Sezer of Elkilany's frequent use of racial epithets, and that they witnessed Elkilany direct those epithets at the Plaintiff. These statements corroborate the Plaintiff's testimony that Sezer ignored her complaints, resulting in the Defendant's failure to take prompt remedial action.

Whether the Plaintiff in fact made those complaints is an issue reserved for the jury, as it requires credibility assessments inappropriate for a summary judgment motion. *See Notaro v. Fossil Indus., Inc.*, 820 F. Supp. 2d 452, 459 (E.D.N.Y. 2011) (Spatt, J.) (denying summary judgment where defendant reacted promptly to a specific complaint but the Plaintiff alleged that "long before this particular complaint in April 2006, they had repeatedly complained to Melisi about the harassment and that he failed to do anything"); *Maher v. All. Mortg. Banking Corp.*, 650 F. Supp. 2d 249, 267 (E.D.N.Y. 2009) (denying summary judgment where the defendant "quickly

took action" after the plaintiff sent a formal complaint to human resources because the plaintiff only sent the letter after the defendant failed to respond to complaints made to the plaintiff's direct supervisor two months earlier).

As for the effectiveness of the Defendant's response, the Defendant did not punish or reprimand Elkilany. Of course, the law does not *require* such a remedy, but the absence of any disciplinary action against Elkilany is pertinent considering that it is not clear from the record that McQuiller's Code of Conduct refresher either happened in the first place or, assuming it happened, actually put an end to Elkilany's racially hostile behavior. The Defendant's primary evidence for the efficacy of its remedial action is the Plaintiff's admission in her deposition that Elkilany never explicitly called her a "nigger" after McQuiller's investigation. However, the Plaintiff also testified in her deposition that Elkilany's "general" use of the slur continued unabated after the Code of Conduct refresher. As a result, the Defendant's argument only holds water if either (1) Elkilany's "general" use of the term is not actionable or (2) Elkilany's behavior in that regard abated after the Defendant's remedies.

The Court already explained why the former assumption is incorrect, *see supra* II.B.2.a, meaning that the Defendant may only obtain summary judgment by demonstrating conclusively that the Code of Conduct refresher resolved Elkilany's misdeeds. *See Fisher v. Mermaid Manor Home for Adults, LLC*, 192 F. Supp. 3d 323, 330 (E.D.N.Y. 2016) (explaining that "the lack of such narrow discriminatory action proves too little" because "the Defendant's response failed to address the continuing hostile actions" after the remedial action); *Kohutka v. Town of Hempstead*, 994 F. Supp. 2d 305, 330 (E.D.N.Y. 2014) (Spatt, J.) (denying summary judgment where there was "evidence that the Plaintiff did not specifically report that she was being treated in a negative way" and the defendant "did take some steps to rectify the worsening situation" due to conflicting

evidence that the Defendant "simply dismissed the Plaintiff's complaints, telling her to 'shrug it off'").

The evidence about the effectiveness of the steps taken by the Defendant, however, is inconclusive. First, the Defendant claims that the Plaintiff never complained about Elkilany's behavior after the Code of Conduct refresher. The Defendant bases its contention on the testimony of McQuiller alone, which the Plaintiff's testimony contradicts. Adding weight to the Plaintiff's testimony, King testified that in June the Plaintiff called her to complain about Elkilany's conduct, and the Plaintiff's June 16, 2015 statement to King discusses Elkilany's continued use of the "N" word," "use of the 'N' word openly and during business" and that she had been "called a N-Word repeatedly." Second, the Defendant also alleges that Pharr's testimony illustrates that Elkilany stopped using the word even in a general manner. However, Pharr only testified that she could not recall specific instances where it occurred, not that his behavior changed. As a result, the Court disagrees with the Defendant's contention that it is undisputed that the Code of Conduct refresher stopped Elkilany's use of the epithet.

The Court therefore denies the Defendant's motion for summary judgment with respect to the Defendant's claim that it cannot be held liable for Elkilany's conduct.

### C. As to the Plaintiff's Retaliation Claims.

For the reasons provided below, the Court grants the Defendant's motion for summary judgment with respect to the Plaintiff's retaliation claims.

#### 1. The Standard of Review.

"The anti-retaliation provisions in Title VII ... and the NYSHRL [ ] contain nearly identical language and are governed by the same burden-shifting analysis." *Wesley-Dickson v. Warwick Valley Cent. Sch. Dist.*, 973 F. Supp. 2d 386, 407 (S.D.N.Y. 2013) (citing *Sarno v. Douglas*

*Elliman–Gibbons & Ives, Inc.*, 183 F.3d 155, 159 (2d Cir.1999); *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 14 (2d Cir.2013)). In particular, at the summary judgment stage, the Plaintiff's retaliation claims are governed by the now infamous *McDonnell Douglas* burden-shifting framework, discussed above. *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005).

At first, this entails making a *prima facie* showing: "(1) that she participated in an activity protected by Title VII, (2) that her participation was known to her employer, (3) that her employer thereafter subjected her to a materially adverse employment action, and (4) that there was a causal connection between the protected activity and the adverse employment action." *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 552 (2d Cir. 2010). The burden of proof that must be met to survive a summary judgment motion at the *prima facie* stage has been characterized as "'minimal' and '*de minimis.*'" *Woodman v. WWOR-TV*, 411 F.3d 69, 76 (2d Cir.2005) (quoting *Zimmermann v. Assocs. First Capital Corp.*, 251 F.3d 376, 381 (2d Cir.2001)). In determining whether this initial burden is satisfied, the court's role is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive. *See Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 58 (2d Cir.1987).

 "[I]f the plaintiff establishes a prima facie case of retaliation, then the burden shifts to the defendant-employer to provide a legitimate, non-retaliatory reason for its actions." *Geras v. Hempstead Union Free Sch. Dist.*, 149 F. Supp. 3d 300, 330 (E.D.N.Y. 2015) (Spatt, J.). Where the Defendant articulates legitimate, non-retaliatory reasons for its employment decision, "then the presumption of retaliation dissipates," *Weber v. City of New York*, 973 F.Supp.2d 227, 265 (E.D.N.Y.2013), and the burden shifts back to the plaintiff to show that the employer's explanation

is actually a pretext for illegal retaliation, *see Johnson v. Cty. of Nassau*, No. 10-cv-06061, 2014 WL 4700025, at *14 (E.D.N.Y. Sept. 22, 2014).

## 2. As to Whether the Plaintiff Suffered an Adverse Employment Action.

As the Supreme court has noted, Title VII's antiretaliation provision "protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006). Accordingly, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68, 126 S.Ct. 2405 (internal quotations and citations omitted). "[P]etty slights, minor annoyances, and simple lack of good manners" are normally too trivial to support a retaliation claim. *Id.*

The Plaintiff alleges that she suffered six separate adverse employment actions: (1) the lack of appropriate corrective action in response to her complaints; (2) King contacting the Plaintiff and asking her questions about allegations made by a coworker; (3) the denial of her application for a management position; (4) transferring her to Lake Grove; (5) denial of requested vacation time; and (6) transferring Elkilany to Lake Grove. The Court will address each in turn.

First, the Defendant's failure to take adequate corrective action is not a cognizable adverse employment action for a retaliation claim. The Second Circuit has recognized that "unchecked retaliatory co-worker harassment, if sufficiently severe, may constitute [an] adverse employment action so as to satisfy the second prong of the retaliation *prima facie* case." *Richardson v. New York State Dep't of Corr. Serv.*, 180 F.3d 426, 446 (2d Cir. 1999). Such claims occur where a plaintiff's "employer allows her co-workers to harass her because she engaged in protected activity." *Id.* at 445. The Plaintiff makes no allegations that Elkilany harassed her <u>*because*</u> she

engaged in protected activity. Rather, she alleges that she engaged in a protected activity because of Elkilany's harassing behavior. In other words, the Plaintiff is attempting to repackage her discrimination claim as a retaliation claim. Lacking any evidence that Elkilany harassed her in response to her complaints, the Plaintiff cannot establish a genuine dispute that his behavior constitutes an adverse employment action. *See Notaro*, 820 F. Supp. 2d at 461 (granting summary judgment where there was "nothing that would support a reasonable factfinder's conclusion that [a coworker's] continuing harassing behavior was retaliatory harassment"); *Garone*, 436 F. Supp. 2d at 471 (granting summary judgment against retaliatory harassment claim where there was "no basis to infer" that the Plaintiff suffered "retaliatory harassment by her coworkers").

Second, the questions the Plaintiff received from King about her coworkers' allegations are not an adverse employment action. In *Rivera v. Rochester Genesee Regional Transportation Authority*, 743 F.3d 11 (2d Cir. 2014), the Second Circuit held that a reasonable juror could infer the defendant's swift response to complaints against the plaintiff, who had recently filed EEOC charges, were "designed to, and did, send a message that [the plaintiff's] employment . . . was in serious jeopardy as a result of the EEOC charges." *Id.* at 27. The Second Circuit based its decision on a counseling meeting with the vice president of the company scheduled shortly after the plaintiff filed their EEOC charges. In the meeting the vice president implored the plaintiff that he "needed to be more careful in his relationships with other employees." Here, the Plaintiff makes no allegation that King made any explicit or implicit threats regarding the complaints filed against her. Rather, it appears that King simply contacted the Plaintiff and collected a statement. Thus the mere fact that King promptly responded to those allegations is insufficient to establish an adverse employment action.

Third, the Plaintiff established a dispute over a material fact as to the denial of her application for a promotion to the Deer Park Store Manager position. *See Siracuse v. Roman Catholic Diocese of Brooklyn*, No. 07-cv-2205, 2010 WL 627114, at *9 (E.D.N.Y. Feb. 23, 2010) ("Failure to promote qualifies as an adverse employment action."). The record indicates that the Plaintiff applied for the position in June 2015, and that the Defendant denied her application while in the middle of investigating her complaints about Elkilany. This satisfies the burden articulated by the Second Circuit. *See Wright v. Goldman, Sachs & Co.*, 387 F. Supp. 2d 314, 323 (S.D.N.Y. 2005) ("As the Second Circuit recently has noted in the context of a failure to promote claim, a specific application is required to 'ensure[ ] that, at the very least, the plaintiff employee alleges a particular adverse employment action.'" (quoting *Petrosino*, 385 F.3d at 227)); *Krachenfels v. N. Shore Long Island Jewish Health Sys.*, No. 13-cv-243, 2014 WL 3867560, at *18 (E.D.N.Y. July 29, 2014) (same).

Fourth, a dispute over a material fact exists regarding the Plaintiff's transfer to Lake Grove. "'An internal transfer can be an adverse employment action if 'accompanied by a negative change in the terms and conditions of employment.'" *Terry*, 336 F.3d at 144 (quoting *Morris v. Lindau*, 196 F.3d 102, 113 (2d Cir. 1999)). The Defendant contends that Lake Grove is a comparable store to Bay Shore because, although Bay Shore is higher volume, ASMs are required to meet lower sales quotas for commission purposes. The Defendant further alleges that the Plaintiff earned higher monthly commissions, on average, at Lake Grove than at Bay Shore.

The record is not clear, as the Defendant suggests, that the transfer was indeed a lateral move for the Plaintiff. The Plaintiff testified that her income was higher at the Bay Shore location due to higher customer traffic. Further, the Plaintiff's compensation statements reveal a sharp decline in her monthly commission upon her transfer to Lake Grove. During her time at Bay Shore,

the Plaintiff earned commission in the amount of $2,057. in April 2015, $1,856.74 in May 2015, $2,206.07 in June 2015. After her move to Lake Grove, however, she earned $1,037.01 in July 2015, $1,195.25 in August 2015, $1,207.34 in September 2015, and $1,203.19 in October 2015. The Defendant appears to base its conclusion that the Plaintiff "on average" earned higher commission at Lake Grove by including her commission from September 2014 ($5,219.01) and October 2014 ($3,223.69), before her transfer to Bay Shore. Based on these statements alone, it is not apparent whether the 2014 or 2015 compensation statements are more reflective of the Lake Grove position. If ASMs at Lake Grove indeed earned less than those at Bay Shore, the Plaintiff certainly has established an adverse employment action. As a result, a disputed issue of material fact exists regarding whether the transfer was an adverse employment action.

Fifth, the Plaintiff's loss of vacation days is not an adverse employment action. "In general, the denial of vacation time does not generally rise to the level of an adverse employment action." *Chukwuka v. City of New York*, 795 F. Supp. 2d 256, 261 (S.D.N.Y. 2011). Moreover, "the denial of a single vacation request, without any indication that there was an absolute prohibition against plaintiff taking any vacation time, is not a material adverse employment action." *Roff v. Low Surgical & Med. Supply, Inc.*, No. 03-cv-3655, 2004 WL 5544995, at *4 (E.D.N.Y. May 11, 2004) (citing *Boyd v. Presbyterian Hosp. in the City of N.Y.*, 160 F.Supp.2d 522, 537–38 (S.D.N.Y.2001)). The Plaintiff testified that the Defendant approved a number of vacation days while at Bay Shore, which the Defendant denied after her transfer to Lake Grove. Specifically, she claims she lost a vacation scheduled for her niece's birthday; had to shorten another vacation; and only got Fridays off for two months despite previously arranging for every Friday off. The record indicates that the managers at Lake Grove attempted to accommodate the Plaintiff's requested time off. Although the Plaintiff disputes this characterization, the record

nonetheless does not reflect the sort of total prohibition on vacation required for the Defendant's behavior to constitute an adverse employment action.

Sixth, the transfer of Elkilany to Lake Grove is not an adverse employment action. The entirety of the Plaintiff's argument in this regard is as follows: "Sprint's transfer of Elkilany (Plaintiff's harasser) to Lake Grove where Plaintiff worked was an adverse employment action. Indeed, in certain situations, like the one present here, a hostile work environment could amount to an adverse action leading to an actionable retaliation claim." ECF 32 at 27. The Court finds that the Plaintiff may not base a retaliation claim on such a decision, for the same reason that Elkilany's discrimination is not an adverse employment action. The Court need not address the question any further, because the Plaintiff's conclusory assertion, which lacks citations to relevant legal authority, is patently inadequate. *See Quinio v. Aala*, No. 15-cv-04912, 2016 WL 2599120, at *2 (E.D.N.Y. May 4, 2016) (rejecting legal argument that "engage[d] in no legal analysis and fail[ed] to set forth any case law purporting" to support the party's position); *Rotblu v. 300 East 74th Street Owners Corp.*, 96-cv-5762, 1997 WL 16063, at *1 (S.D.N.Y. Jan. 16, 1997) (noting that defendant's failure to cite any legal authority in support of its motion "effectively places on the court the burden of conducting the initial legal analysis that is properly the responsibility of defendant's counsel" and is "unacceptable").

Therefore, the Plaintiff has established genuine disputes over material facts regarding the denial of her promotion and her transfer to Lake Grove, but not her other alleged adverse employment actions.

### 3. As to the Causal Connection Between the Plaintiff's Complaints and the Alleged Adverse Employment Actions.

"[P]roof of causation can be shown either: (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial

evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000).

"Once the plaintiff has established a *prima facie* showing of retaliation, the burden shifts to the employer to articulate some legitimate, non-retaliatory reason for the employment action." *Zann Kwan v. Andalex Group LLC*, 737 F.3d 834, 845 (2d Cir. 2013). If the employer meets this burden, "the presumption of retaliation arising from the establishment of the prima facie case drops from the picture." *Id.* (citing *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000)); *see also James v. N.Y. Racing Ass'n*, 233 F.3d 149, 154 (2d Cir.2000) ("[O]nce the employer has proffered a reason for its action, all presumptions and special rules drop away; a case under Title VII becomes like any other case in that the plaintiff, in order to prevail, must have evidence from which the factfinder can reasonably find the essential elements of the claim"). The Plaintiff must then prove the retaliation claim under the traditional principles of but for causation, which "'require[] proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer.'" *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360, 133 S. Ct. 2517, 2533, 186 L. Ed. 2d 503 (2013).

However, "[r]equiring proof that a prohibited consideration was a 'but-for' cause of an adverse action does not equate to a burden that such consideration was the 'sole' cause." *Geras*, 149 F. Supp. 3d at 330. Stated differently, "a plaintiff's injury can have multiple 'but-for' causes, each one of which may be sufficient to support liability." *Kwan*, 737 F.3d at 846 n. 5. "A plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action." *Id.* at 846. "A plaintiff may rely on evidence

comprising her *prima facie* case, including temporal proximity, together with other evidence such as inconsistent employer explanations, to defeat summary judgment at that stage." *Id.* at 847. That being said, "temporal proximity alone is insufficient to defeat summary judgment at the pretext stage." *Id.* Ultimately, the employer will be entitled to summary judgment unless the plaintiff "point[s] to evidence that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation." *Cifra v. G.E. Co.*, 252 F.3d 205, 216 (2d Cir. 2001).

Preliminarily, the Court finds that the Plaintiff failed to establish causation with regard to the actions for which the Court already granted summary judgment against the Plaintiff, namely, Elkilany's harassment; King's questions about the allegations of a coworker; the denial of requested vacation time; and the transfer of Elkilany to Lake Grove. As the Court previously discussed, the record illustrates that these actions occurred for reasons wholly unrelated to the Plaintiff's decision to complain about Elkilany's behavior.

With that in mind, the Court will turn to the Plaintiff's remaining surviving claims. For those claims, the supposed causal connection hinges on the temporal proximity between her complaints and the purported adverse employment actions she suffered. Her argument is as follows: she made a formal complaint to the Defendant's human resources department on June 16, 2015, and accidentally forwarded her statement regarding her complaint to Sezer on June 22, 2015. Four days later, McQuiller transferred her to Lake Grove. Within the next month or so, the Defendant denied her application for a promotion.

First, as to the denial of the Plaintiff's application for a management position, McQuiller testified that the panel selected Kennedy over the Plaintiff because of his experience and plans for moving the store forward. Further, in an August 2, 2015, e-mail to the Plaintiff, McQuiller

explained to the Plaintiff that the panel "was looking for more tangible sales driving ideas…based on initiatives that you have done at Bay Shore. Was looking for more meat there." The Plaintiff's only response to this contention is a general denial. However, the portion of the record she cites only states that McQuiller made the decision unilaterally, and not with the consensus of the panel. While Sezer's statements certainly diminish McQuiller's credibility, they "are not sufficient to raise a genuine question regarding whether the defendants' justification was a pretext for discrimination as they do not demonstrate that defendants' reasons for termination were a guise for a discriminatory motive." *Fanelli v. New York*, 200 F. Supp. 3d 363, 374 (E.D.N.Y. 2016) (finding Plaintiff failed to establish pretext by raising testimony that merely cast doubt upon credibility without more); *Forte v. Liquidnet Holdings, Inc.*, 2015 WL 5820976, at *11 (S.D.N.Y. Sept. 30, 2015) (citing Saulpaugh v. Monroe Cmty. Hosp., 4 F.3d 134, 142 (2d Cir.1993) ("[I]t is important to emphasize that a Title VII plaintiff does not necessarily meet its burden of persuasion by convincing the factfinder that the employer's non-discriminatory explanation is not credible; rather, the trier of fact must find that the plaintiff has proven its explanation of discriminatory intent ....")).

Second, as to the Plaintiff's transfer to Lake Grove, McQuiller testified that Lake Grove needed a strong ASM, that the Plaintiff had previous success at Lake Grove, and that he believed transferring her there would allow her to refocus her efforts on her career and remove her from the distractions at Bay Shore in light of the complaints made against her. In response to this proffered reason, the Plaintiff points to a statement from the May 9, 2015 meeting with Sezer and Elkilany, in which Sezer said "Since you guys can't get along with each other, why don't you just transfer to another store?" However, this statement, at best, illustrates Sezer's general preference. It in no way disputes McQuiller's explanation of the non-retaliatory reasons for transferring the Plaintiff.

As it is undisputed that McQuiller, not Sezer, made the decision to transfer the Plaintiff, the Plaintiff failed to establish a genuine dispute over a material fact on this issue.

To be sure, it is not the case that the Plaintiff has <u>no</u> evidence that the Defendant's proffered explanations for her adverse employment actions are pretextual. The Plaintiff's June 16, 2015 and June 22, 2015 statements to King show that Sezer implicitly threatened the Plaintiff that continuing with her complaints could have negative consequences. Sezer's statements somewhat support the conclusion that the Defendant retaliated against the Plaintiff for going ahead with those complaints. The Plaintiff, however, fails to tie those statements either to the adverse employment actions at issue or to the relevant decisionmaker behind those actions, namely, McQuiller. While the Court must draw all reasonable inferences in the Plaintiff's favor, in the absence of additional evidence, the Plaintiff's causation arguments amount to pure speculation, which is insufficient to create a genuine dispute over a material fact as a matter of law.

Accordingly, the Court grants the Defendant's motion for summary judgment dismissing the Plaintiff's retaliation claims.

## D. AS TO THE AVAILABILITY OF PUNITIVE DAMAGES.

Punitive damages are available under Title VII where an employer discriminates or retaliates against an employee with "malice" or "reckless indifference" to the employee's federally protected rights. *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 534, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999) (quoting 42 U.S.C. § 1981a(b)(1)); *see Farias v. Instructional Sys., Inc.*, 259 F.3d 91, 101–02 (2d Cir.2001). A plaintiff can satisfy this burden by presenting evidence that the employer discriminated (or retaliated) against her with "conscious knowledge it was violating the law," or that it engaged in "'egregious' or 'outrageous' conduct from which an inference of malice or reckless indifference could be drawn." *Farias*, 259 F.3d at 102.

Even where a plaintiff establishes malice or reckless indifference, a corporate defendant may still avoid liability for punitive damages by showing that it "[1] had an antidiscrimination policy and [2] made a good faith effort to enforce it." *Zimmermann*, 251 F.3d at 385. In *Kolstad*, the Supreme Court made clear that, "in the punitive damages context, an employer may not be vicariously liable for the discriminatory employment decisions of managerial agents where these decisions are contrary to the employer's good-faith efforts to comply with Title VII." 527 U.S. at 545, 119 S.Ct. 2118. Although egregious or outrageous conduct is evidence of the subjective intent to violate federal law, such conduct is not necessary for a finding of intentional discrimination warranting punitive damages. *Id.* at 538, 119 S.Ct. 2118.

The Plaintiff contends that punitive damages should be on the table because the Defendant and its managerial agents were aware that creating and maintaining a hostile work environment was illegal. Thus, the Plaintiff believes that the lack of remedial action in response to the Plaintiff's claims demonstrates that they acted knowingly and recklessly with respect to the Plaintiff's rights. In the Court's view, this argument misstates the Plaintiff's burden. The relevant question is not whether the Defendant knew that a hostile work environment, in the abstract, violated federal law. Rather, to sustain a punitive damages award, the Plaintiff must demonstrate that the Defendant "discriminate[d] in the face of a perceived risk that its actions will violate federal law to be liable in punitive damages." *Id.* at 536, 119 S.Ct. 2118.

The record lacks any evidence that the Defendant possessed such knowledge. In fact, it indicates the opposite – that McQuiller and King failed to discipline Elkilany because they believed that the Plaintiff's allegations were uncorroborated. In other words, they thought they were complying with the law. Without more, the fact that the Defendant failed to enact prompt and effective remedial action cannot support a punitive damages award. *See Wiercinski v. Mangia*

*57, Inc.*, 787 F.3d 106, 115 (2d Cir. 2015) ("The only conduct that can be imputed to Mangia that Wiercinski alleges was "malicious" or "recklessly indifferent" was Cymanow's alleged failure to act after Wiercinski complained to her about the discrimination. Even if this fact could establish an employer's liability for co-worker harassment, it does not, by itself, warrant an award of punitive damages."). Finding otherwise would collapse the standard for punitive damages (recklessness) into the standard for imputing misconduct of coworkers to an employer (negligence), such that punitive damages would be awarded in every case where a plaintiff established a hostile work environment.

Therefore, the Court grants the Defendant summary judgment with respect to the Plaintiff's claim for punitive damages.

### III.  CONCLUSION

For the foregoing reasons, the Court grants the Defendant's motion for summary judgment dismissing the Plaintiff's gender-based hostile work environment claims and retaliation claims with prejudice. The Court denies the Defendant's motion for summary judgment with respect to the Plaintiff's race-based hostile work environment claims.


It is **SO ORDERED**:

Dated:  Central Islip, New York

March 22, 2019

_____/s/ Arthur D. Spatt_____

ARTHUR D. SPATT

United States District Judge